STONE, C. J., and KUHN, OSTRANDER, BIRD, STEERE, BROOKE, and PERSON, JJ., concurred.

---

## RAND *v.* RODGERS.

FRAUDULENT CONVEYANCES—BILL IN AID OF EXECUTION—EVIDENCE —ESTATE BY ENTIRETIES.

Evidence in a suit in aid of complainant's execution against defendant's homestead, which he had transferred to himself and wife by the entirety, *held*, to sustain the bill and warrant a decree in favor of complainant setting aside the conveyance, saving only defendant's homestead rights.

Appeal from Muskegon; Sullivan, J. Submitted April 12, 1916. (Docket No. 104.) Decided June 1, 1916.

Bill in aid of execution by Esther Chrystal Rand, administratrix of the estate of William F. Chrystal, deceased, against Alexander Rodgers and another. From a decree for complainant, defendants appeal. Affirmed.

*Clink & Farmer*, for complainant.

*William Carpenter* (*Charles B. Cross*, of counsel), for defendants.

The bill of complaint in this cause is filed in aid of execution. On May 18, 1914, plaintiff recovered a judgment against defendant Alexander Rodgers in the sum of $3,929.86. The amount of this judgment represented the balance due from said defendant Alexander Rodgers to the estate of William F. Chrystal upon the purchase price of 1,000 shares of stock of the Rodgers Iron Manufacturing Company of the par value of $10 each, which had been purchased by said defendant Alexander Rodgers from said estate on November 27, 1911. On April 4, 1913, defendant Alexander Rodgers was the owner of a certain house and lot in the city of Muskegon of the value of about $4,500. On that day he and his wife executed a deed of said house and lot to one Louis E. Conroy, who, upon the same day, reconveyed the same to defendants Alexander Rodgers and Margaret A. Rodgers, as tenants by the entirety. The expressed consideration in both of these conveyances was the sum of $1. Prior to the 6th day of March, 1916, defendant Alexander Rodgers had been the owner of a large majority of the stock of the Rodgers Iron Manufacturing Company, the capitalization of which was the sum of $50,000. For some time prior to March, 1913, the business had been gradually declining, the plant was old, and defendant Alexander Rodgers himself seems to have become somewhat dissipated and inattentive to business. On the 6th day of March, 1913, in an effort to rehabilitate the business and secure further capital, a majority of the stock, 2,501 shares, was by defendant Alexander Rodgers assigned to one Lincoln Rodgers, apparently without consideration, except that Lincoln Rodgers was to raise $5,000 by indorsing the paper of the com-

pany for its use.  Other amounts of stock theretofore
owned or standing in the name of Alexander Rodgers
were assigned to others, so that after said date but a
few hundred shares remained in the name of said
Alexander Rodgers.  The exact amount is difficult of
determination from the record, and, in view of what
occurred later, is of little importance.  After the re-
organization of March, 1913, the company continued
to do business until the 6th day of August, 1913, when
a voluntary petition in bankruptcy was filed and the
business liquidated.  The total assets, real and per-
sonal, of the company brought $7,600, which was dis-
bursed by the trustee to the various creditors and was
sufficient to pay only 37 2/5 per cent. of the debts of
the corporation.  It is asserted in the bill of complaint
that the conveyance by Rodgers of the house and lot,
which was occupied as a homestead, to himself and
wife as tenants by the entirety was a fraud upon his
creditors, it being claimed that upon the date of the
transfer he was actually insolvent, and that the con-
veyances in question were made for the purpose, if
possible, of saving from the creditors this remnant
of his once considerable property.  The learned circuit
judge who heard the case made a decree setting aside
the conveyances in question and subjecting the prop-
erty described therein to the levy of the plaintiff ex-
cept as to the homestead rights of the defendants.
From this decree defendants have appealed.

BROOKE, J. (*after stating the facts*).  There is only
one disputed question of fact in the case, and that is as
to whether, at the time the conveyances in question
were made, the defendant Alexander Rodgers was in
fact possessed of sufficient property aside from that
covered by the deeds to satisfy his obligations.  It is
strongly urged by counsel for defendants that at the
time said conveyances were made defendant Alexander
Rodgers not only believed himself to be possessed of

sufficient property, aside from his homestead, to satisfy his creditors, but that in fact he was solvent. Upon the hearing defendants introduced two trial balances of the business of the corporation, one dated March 31, 1913, and the other April 30, 1913. They appeared to have been made under the direction of Louis E. Conroy, who was secretary of the corporation and had been connected with the business from November, 1912, and who was himself the conduit through which the title to the house and lot in question passed. These balance sheets both show assets of the corporation largely in excess of liabilities, and the witness Conroy testified that he believed the values placed upon the several assets to have been fair and conservative. The total assets as shown by the trial balance of April 30, 1913, were $61,645.33, and liabilities at that time, aside from the capital stock liability of $50,000, were only $11,645.33. From these figures it is argued by counsel for appellants that the interest of defendant Alexander Rodgers in the corporation on the 4th day of April, 1913, was sufficient to satisfy his creditors and that therefore he had a right, under the law, to settle the house and lot upon himself and wife. Pressed upon cross-examination, the witness Conroy, who seems to have had an intimate knowledge of all matters in connection with the controversy, would not say that in his opinion the defendant Alexander Rodgers, at the time the deeds were made, was solvent. In the course of his examination the following occurred:

"*Q.* Didn't you tell me that you were having a hard time—you were doing all you could to get Alex's matters straightened out so that you could legally have this house transferred to Alex and his wife jointly?

"*A.* I don't recollect it. I might have made some such statement as that to you, because I had that in mind. The only reason that I didn't deed it before I did was because I didn't want it to appear as though

I was deeding something away that—or doing something that might appear as though it wasn't right.

"Q. As though it was to defraud creditors?

"A. Yes, sir; and I purposely left that, and it was delayed.

"Q. Let me call your attention specifically. Sitting in the lobby of the Occidental Hotel one evening when we were talking this matter over, don't you remember of talking with me in that place about it?

"A. I do; yes, sir.

"Q. Didn't you tell me that you wanted more time—you wanted to do something; get a little more time—and you were going to try to straighten out this whole matter and get Alex's matters all straightened out so that you could deed, or have deeded, to Alex and his wife this house jointly? Have you no recollection of that at all?

"A. I don't remember of—I can't remember that I ever did make a statement of that kind to you, and yet I don't doubt that I probably did, too, because I had it in mind, and it would have been the most natural thing in the world to have mentioned that to you. I wouldn't say that I didn't make a statement of that kind. I had it in mind, and I wanted to get everything; I wanted to deed that house at that time and had wanted to. I wanted to get things straightened out so that they would look all right on the face of them before doing anything of that kind.   *   *   *

"Q. Didn't you realize all the time that Alex Rodgers' affairs were in a very bad way?

"A. I did; yes, sir.

"Q. And from the time you went there and looked into the business you knew that, didn't you?

"A. Yes; I did.   That is one of the thoughts that undoubtedly governed me in my ideas, my wish to have that redeeded.   I probably had it—

"Q. That is what I thought.

"A. It probably had its weight.

"Q. You saw just as quick as you got into that business that it was only a question of what Alex could save out of the stock and save his home, wasn't it?

"A. It was; yes, sir.

"Q. That is all there was to it?

"A. Yes, sir."

While the fact that the entire assets, real and personal, of the corporation within five months of the date of the transfer sold for only $7,600 is not controlling, we are still of opinion that it is not without a legitimate bearing upon the fairness of the trial balance upon which so much stress is laid by counsel for appellants. That fact, taken in connection with the very frank testimony of the witness Conroy, convinces us that in the spring of 1913, when the transfer was made, the stock of the corporation had very little real value. It was held by defendant Alexander Rodgers himself to be of so little value that he gave $25,000 of it to Lincoln Rodgers for the purpose of securing an indorsement upon the corporation paper to the amount of $5,000, and this transaction was accomplished only about a month prior to the making of the deeds.

Upon the facts as disclosed by the record, we have no hesitation in agreeing with the finding of the learned circuit judge that at the time the deeds were made the defendant Alexander Rodgers was not possessed of property, aside from that in question, sufficient to pay his debts. Under such circumstances the deeds must be set aside. *Fellows* v. *Smith,* 40 Mich. 689; *Matson* v. *Melchor,* 42 Mich. 477 (4 N. W. 200) ; *Felker* v. *Chubb,* 90 Mich. 24 (51 N. W. 110) ; *Hackett* v. *Kenning,* 170 Mich. 583 (136 N. W. 349).

The decree is affirmed, with costs.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, STEERE, and PERSON, JJ., concurred.